Weldon, J.,
delivered the opinion of the court:
Tbe claimant is a corporation organized under the laws of New Jersey, and on the 2d of April, 1893, had a place of business in the city of New York, to wit, a tobacco factory.
On that day the factory of claimant was burned. Among the contents of the building were certain United States internal-revenue stamps of the face value of $4,100.10, and this suit was brought to recover the value of such stamps for the use of certain insurance companies named in the petition, which had paid a total loss on the contents of the factory amounting to the sum of $78,635.47. The stamps had been purchased by the company from the United States collector. Of the' stamps, the value of $1,356.63 was attached to packages of tobacco which had not been sold or offered for sale or removed from the factory, and stamps of the value of $2,743.47 had not been attached to packages of tobacco, making, in the aggregate, the sum of $4,100.10.
On or about the 1st day of November, 1893, the claimant filed with the Treasury Department, in accordance with the rules and regulations of the Department, a claim for the stamps, which had been examined and certified as true and correct by the United States revenue collector, but without recommendation of payment, for the reason that the claimant had “been paid by the insurance companies for the value of the stamps;” and on the 14th day of February, 1894, the Department rendered its decision upon said application, declining to allow the same, for the reason “ that satisfactory evidence has been furnished to this office that you have received reimbursement of the value of said stamps by the recovery of insurance thereon.” On the 2d of April, 1895, the company, by its attorneys, filed an amended petition for the redemption of the stamps and asked for a rehearing, and on the 10th of April the Department refused to grant a rehearing, and thereupon this suit was brought.
The insurance companies paid, as aforesaid, the sum of $78,635.47 to the company, which included the face value of the stamps.
In the adjustment and payment of the loss it was agreed by the claimant that the insurance companies should be entitled to the value of the stamps, to be recovered by the claimant *218 from tbe defendants on the application aforesaid or by other proceedings.
The claim for the redemption is made under section 3426 of the Revised Statutes, as amended by the act of March 1,1879, and the amount due, if the claimant is entitled to recover, is the sum of $4,100.10.
“ By au existing regulation of the Commissioner of Internal Revenue, made June 12,1873, by authority of the act of June 30,1864, section 11, afterwards reenacted as Revised Statutes, section 3426, all claims arising under that section were required to be made upon a certain printed form called ‘ Form 38,’ and ever since some time in 1875, and probably earlier, all claimants under the said section have been required to make oath, upon Form 38, that they have ‘ not heretofore presented any claim for the refunding of the above-mentioned amount or any part thereof,’ and ‘that the valne or reimbursement of the value of said stamps, or any portion thereof, has not heretofore been received by claimant, directly or indirectly.’” (Findings is and x.)
In presenting the claim as stated in finding iv the claimant’s general manager did not make the oath referred to in finding ix in the form required by the Commissioner of Internal Revenue, but, instead of taking the required oath, he made oath that the claimant had “ not heretofore presented any claim to the Government for the refunding of the above-mentioned amount or any part thereof,” and “that the value or reimbursement of the value of said stamps, or any portion thereof, has not heretofore been received by claimant, directly or indirectly, from the Government.”
This proceeding is founded on the following section of the Revised Statutes (§ 3426, Supp. vol. 1, 2d ed., p. 241):
“ The Commissioner of Internal Revenue may, upon receipt of satisfactory evidence of the facts, make allowance for or redeem such of the stamps issued under the provisions of this title, or of any internal-revenue act, as may have been spoiled, destroyed, or rendered useless or unfit for the purpose intended, or for which the owner may have no use, or which, through mistake, may have been improperly or unnecessarily used, or where the rates or duties represented thereby have been excessive in amount, paid in error, or in any manner Avrongfully collected; and such allowance or redemption shall be made either by giving other stamps in lieu of the stamqis so allowed for or redeemed, or by refunding the amount or value to the owner thereof, deducting therefrom, in case of repayment, the percentage, if any, allowed to the purchaser thereof.
*219 “ But no allowance or redemption shall be made in any case until the stamps so spoiled or rendered useless shall have been returned to the Commissioner of Internal Revenue, or until satisfactory proof has been made showing the reason why the same can not be so returned.”
The findings show that the disallowance was made not because satisfactory proof had not been made of the destruction and loss, but for the reason that the claimant had been reimbursed by the insurance companies for the loss, and therefore was not entitled to compensation and reimbursement from the defendants. The proof of loss had been examined and certified as sufficient to establish the fact of destruction by the collector, but no recommendation was made for payment, for the reason that no legal obligation rested upon the defendants to reimburse the claimant for the use and benefit of the insurance companies.
The questions presented by this record involve the inquiry whether the destruction of stamps in connection with the action of the claimant and the Department gives the right of recovery; and if so, whether such right can be asserted for the benefit of the insurance companies, which were the real losers in the destruction of the stamps.
It is insisted that the facts establish a right of recovery in the name of the claimant for the use of the insurance companies, they having suffered the loss by the payment of the value of the stamps to the claimant. Upon the part of defendants it is insisted that the refusal of the Commissioner of Internal Revenue to pay upon the application set forth in the findings is justified in law, and that the claimant, having been reimbursed by the payment of insurance, has no cause -of action which can be asserted for the benefit of the insurance companies.
Under the common-law practice it is of frequent occurrence that the legal cause of action is laid by the pleading in one party, while the use or real right is asserted to be in another. This form of pleading is always adopted when the legal title remains with the original party but the real and substantial ownership has passed to the person for whose use the suit has been brought. The common law, averse though it is to the transfer of choses in action, except negotiable paper, has recognized that form of judicial proceeding which distinguishes *220 between the legal and naked ownership and the real ownership of parties.
But it is insisted in answer to that theory of the law that by section 3477, Revised Statutes, all transfers and assignments of claims against the United States are void unless such assignments are made in a particular way and after the allowance of the claim. This contention will be noticed hereafter.
In this connection it maybe said that stamps are not sold to manufacturers and dealers in payment of tax, but for the purpose of being used when a tax becomes payable by a certain condition of the commodity. That principle is recognized and established by the decision of the Supreme Court in the case of Jones v. Bentheyson (103 U. S., 87), in which it is substantially held that a dealer is not liable to be taxed for the revenue stamps required to be affixed thereto before the removal thereof, unless they were at the time of such sales so affixed, whereby they entered into the value of the tobacco and formed a part of the price. This same doctrine was laid down in a subsequent decision of the same case in 115 U. S., 465.
The Commissioner of Internal Revenue, who is intrusted with the execution of the statute under consideration, in 1889 had ruled that “the tax upon cigars or cigarettes accrued upon the sale or removal from the place of manufacture for consumption or sale.”
It is for that reason that section 3426 provides in substance that the Commissioner of Internal Revenue may from time to time make regulations for an allowance for stamps which may have been spoiled, destroyed, or rendered useless or unfit for the purpose intended, and such allowance may consist either in giving new stamps or paying the value.
The policy and purpose of that section of law are clearly manifest. It enables manufacturers and dealers to furnish themselves with supplies of stamps before the necessity of their immediate use without incurring the danger and risk of loss and destruction.
The facts found by the court establish the sale by the United States of $4,100.10 of revenue stamps for the purpose of paying tax on a certain amount of tobacco, the destruction of those stamps before their use in the payment of tax, and the consequent loss of that amount of money by the insurance companies.
*221 If tbe United States bad issued new stamps predicated upon tbe loss, they would simply bave suffered to tbe extent of tbe cost of tbe new.
At tbe time of tbe destruction of tbe stamps there was resting on tbe defendants a legal obligation to reimburse tbe claimant in case of a loss upon certain conditions prescribed in a general way by section 3426 of tbe Revised Statutes.
Tbe findings show not only a loss of tbe stamps, but that sucb loss was found by tbe revenue collector of tbe district of tbe claimant, and that sucb loss was recognized by tbe Department, but payment was refused upon tbe ground that tbe claimant bad recovered from tbe insurance companies tbe value of sucb stamps.
Tbe claim was disallowed in tbe Department, not upon a question of fact, but a question of law, to wit, tbe effect of being reimbursed by tbe payment of .an insurance policy.
Tbe case of Campbell v. The United States (107 U. S., 407), cited at tbe present term in tbe case of Mary J. Glynn v. The United States (ante, p. 82) upon tbe question of jurisdiction, is applicable to a phase of tbe controversy in this proceeding, in showing that tbe law is tbe paramonnt and controlling consideration, and that regulations are intended to execute laws and must be made for that purpose and in strict subserviency to its requirements.
In that connection tbe Supreme Court says:
“The argument of counsel for the United States is that until the officers of tbe customs comply with all tbe regulations of tbe Secretary of tbe Treasury, and tbe collector issues tbe drawback certificate, tbe law imposes upon tbe United States no obligation to pa.y anything for sucb drawback; that tbe law conferred upon the Secretary tbe right to make the regulations and tbe collector tbe power to make the certificate for payment of drawback, and that tbe refusal of tbe collector to perform tbe duties imposed upon him preliminary to making bis certificate, and then refusing tbe certificate, totally defeats tbe claim of the party, who, by tbe law, is guaranteed a right to bis drawback, and who has complied with all that the law requires of him to secure and enforce it.w
Tbe court, after a further discussion of tbe law in tbe same direction, says:
“We think tbe Court of Claims has jurisdiction of sucb a claim, (1) because it is founded on a law of Congress, and (2) because tbe facts found in this case raise an implied contract *222 that the United States will refund to the importer the amount he paid to the Government.” * * *
Section 3426 provides for the right asserted by the claimant to be regulated by the Commissioner of Internal Eevenue “ upon proper, evidence of the facts.” The fact contemplated by the statute is the destruction of the stamps, which was found by the action of the Commissioner; but he found a further fact, to wit, that the claimant had been reimbursed by payment from an insurance company. If the Commissioner had found by examination of the case that a payment had been made by the United States, upon every principle of law and justice-that would have defeated the claim and justified the officer in withholding compensation either in stamps or money.
But can that much be said of a payment by a party having-no privity with the United States, and not acting in behalf of the United States, but simply in the discharge of a contract which had been made affecting the subject-matter of this claim?
Under Form 38 the claimant under section 3426 was required to make oath “that the value or reimbursement of the value of said stamps, or any portion thereof, has not heretofore been received by claimant, directly or indirectly.”
In the disallowance of the claim the Commissioner so construed and applied that regulation as to prevent the allowance because the claimant had amended the ordinary oath by the insertion of the words “to the Government” and “from the Government.”
We think the construction of Form 38 was notin accordance with the purpose and spirit of the law providing for compensation or restitution in cases of properly authenticated loss of revenue stamps.
We now come to the remaining question, Is the claimant entitled to recover as the legal owner of the claim for the use of the party who in equity is entitled to the compensation ?
This right is asserted under and by force of the long-established and well-recognized equitable doctrine of subrogation, which is defined to be “ the putting of a third person who has paid a debt in the place of the creditor to whom he has paid it so that he may exercise against the debtors all the rights which the creditor, if unpaid, might have done. It is of two *223 kinds, éitber conventional or legal, the former being where the subrogation is' express by the acts of the creditor and the third person, the latter being (as in the case of sureties) where the subrogation is implied by the law.” (Abbott’s Law Dictionary, p. 511; Bisp. Prin. Eq., § 335.)
The statute which prohibits assignments by the voluntary acts of the parties did not intend by its operation to destroy or limit the equitable doctrine of subrogation, which the common law has recognized and enforced from time immemorial, and which has been most effectual iu preserving just rights to parties litigant. It was held in the case of Erwin v. The United States (97 U. S., 392) that “the act of Congress of February 26,1853, to prevent frauds upon the Treasury of the United States,” which was the subject of consideration in the Gillis Case, “ applies only to the voluntary assignment of demands against the Government. It does not embrace cases where there has been a transfer of title by operation of law. The passing of claims to heirs and devisees or assignees in bankruptcy are not within the evils at which the statute aimed, nor does the construction given by this court deny to such parties a standing in the Court of Claims.”
In the case of Goodman v. Niblack (102 U. S., 556) it was held that section 3477, Revised Statutes, did not prevent a cl aim from passing to an assignee under a general assignment for the benefit of creditors. The court said:
“In what respect does the voluntary assignment for the benefit of creditors which is made by an insolvent debtor of all his effects, which must, if it be honest, include a claim against the Government, differ from an assignment which is made in bankruptcy?”
The same principle was announced in the case of Redfield v. The United States (27 C. Cls. R., 399).
The rights of parties where the condition of subrogation arises are very succinctly and clearly stated by Mr. Justice Strong in the case of Hall & Long v. Railroad Companies (13. Wall., 370). That was a proceeding against the defendant as a common carrier to recover for a loss of goods in violation of the contract to safely carry, in which the rights of the insurer became the subject of litigation and inquiry. In that connection the court says:
“Standing thus, as the insurer does, practically in the position of a surety, stipulating that the goods shall not be lost *224 or injured iu consequence of the peril insured against, whenever bebas indemnified the owner for the loss be is entitled to all the means of indemnity which the satisfied owner held against the party primarily liable. His right rests upon familiar principles of equity. It is the doctrine of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner. Hence it has often been ruled that an insurer who has paid a loss may use the name of the assured in an action to obtain redress from the carrier whose failure of duty caused the loss.”
A question similar to the one now under consideration came before the court in the case of Shaw v. The United States, reported in 8 C. Cls. R., 488. That suit was brought under the act of March 3, 1849, authorizing the Third Auditor to make awards for impressed property.
The owner had an insurance on the vessel which had been paid to him, and in the settlement the Third Auditor deducted the amount of the insurance from the value of the vessel. The claimant brought suit for the value of the vessel, the court held that he Avas not entitled to recover, and a majority of the judges held “that so far as the rights of the insurance companies are involved a recovery may be had on their behalf if proper proof be made of the payment of the insurance and proper averments be inserted in the petition.”
The petition was amended and came on again for trial, in which the court held that the transaction amounted to contract, the owners being in charge of the boat, and not an impressment under the act of 1849. (Shaw v. The United States, 9 C. Cls. R., 388.)
The case under the last decision went to the Supreme Court, and is reported in 93 U. S., 235.
The Supreme Court affirmed the decision of this court, holding in substance that there was no liability against the United States for the loss of the vessel; that they were charterers of the steamer under a contract. In the record of the Supreme Court it is stated that the amended petition prays for a recovery of the said sum of $25,000 “for the use and benefit of said insurance companies,” which amendment was filed by leave of the court.
The action of this court was a clear recognition of the right to use the form “for the use” in the protection of the equitable rights of the parties growing out of the doctrine and law of *225 subrogation, and while the decision of the Supreme Court does not reach that question in the determination of the case, the judgment of the court below was affirmed with that form of pleading.
In the case of Jackson v. The United States (1 C. Cls. R., 260) the doctrine of equitable right, to the extent of permitting a suit to be. maintained in the name of the person having the legal title “for the use,” was recognized by the decision of the court. Although the transaction upon which the proceeding was based was before the enactment of the statute of 1853, it was held that upon the general principles of the law choses in action were not assignable; yet an equitable right might originate, which would be protected by judicial proceeding adapted to the preservation of the right of the real and beneficial party in interest. The suit in that case was brought on assigned bills of exchange in the name of the assignee, and the court decided that the bills were void in tlie hands of a third party, for the reason the Indian agent who had drawn them had no authority to do so. In speaking of the original contract and consideration the court says:
“They are not assignable at law, and though a transfer may operate as an appointment or equitable right to the sum, yet it will not authorize the company to maintain a suit against the debtor in his own name. This in most cases is obviated by the use of the name of the original party, and the court will so mold the proceedings and control the judgment that no injury or injustice may result to the legal or equitable plaintiff in the case.”
In the case of Silverhill v. The United States (5 C. Cls. R., 610), under the Abandoned or Caytured Property Act (12 Stat. L., 820), a suit was brought in the name of an assignor for the use of an assignee, although the alleged facts disclosed that the property had been sold by the assignor to the assignee before its capture by the United States. The court in a preliminary opinion recognized the doctrine of equitable right and sustained the form of pleading, which asserted the legal title in the nominal plaintiff and the beneficial title in the real party in interest.
The court says: “By the decision in Cole’s Case (3 C. Cls. R.; 64) it was determined that these captured-property cases came within the prohibition of the Act- of 26th February, 1853 *226 (10 Stat. L., 17), forbidding transfers and assignments of claims against the United States. But it was earlier determined that the court could save tbe equitable rights of an assignee by allowing the suit to be brought in the name of the assignor, the recovery to be by the latter for the use of the former." (Jackson v. The United States, 1 C. Cls. R., 260.)
These cases are cited for the purpose of showing that by the practice of this court, long established, the old form “for the use ” is a proper form of pleading, not for the purpose of asserting a legal or even equitable title in the chose in action in the assignee which could by any possibility be asserted to the prejudice of the Government, but to so mold, as it is said, “the proceedings and control the judgment that no injury or injustice may be done.”
In the passage of the act of 1853, and its subsequent enactment in the Revised Statutes (§ 3477), Congress did not intend (by the prohibition of the assignment of choses in action pertaining to the Government) to destroy and abrogate the rights of subrogation, which had been recognized by courts of law and courts of equity administering the common law, in connection with the doctrine that upon the grounds of public policy choses in action could not be assigned so as to change the legal obligations and rights from the assignor to the assignee.
The purpose of the law of 1853 was to confine the obligations of the Government to the party or parties with whom it had contracted, to secure the personal service in the performance of the contract, and more especially to prevent the complications and troubles which might arise in the adjustment of the rights of parties because of the transfer of the contracts and obligations of the Government. No complication or trouble as to these rights can arise out of the subrogation of the rights of the parties.
The obligations and responsibilities of the original parties are to be determined upon the same basis as if no subrogation had intervened.
It is the judgment of the court that the claimant recover, as indicated in the conclusion of law, the sum of $4,100.10.